# EXHIBIT W

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| Wangs Alliance Corporation,<br>d/b/a WAC Lighting,<br><br>        Plaintiff,<br><br>v.<br><br>Lumien Enterprise, Inc.,<br>d/b/a Lumien Lighting,<br><br>        Defendant. | )<br>)<br>) Civil Action No. 1:21-cv-5270-VMC<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF THOMAS L. CREDELLE

TABLE OF CONTENTS

I.      BACKGROUND AND QUALIFICATIONS ..................................................1

II.     MATERIALS CONSIDERED AND BASIS FOR MY OPINIONS ..............2

III.    DESCRIPTION OF THE RELEVANT TIMEFRAME ...............................3

IV.     LEVEL OF ORDINARY SKILL IN THE ART ..........................................3

V.      MY UNDERSTANDING OF CLAIM CONSTRUCTION...........................4

VI.     ASSERTED CLAIMS ..................................................................................5

VII.    AGREED-UPON CONSTRUCTIONS.........................................................5

VIII.   DISPUTED TERMS ....................................................................................9

IX.     SCOPE AND SUMMARY OF OPINIONS................................................10

X.      OVERVIEW OF THE ASSERTED PATENTS..........................................11

XI.     RELEVANT PROCEDURAL FACTS........................................................17

XII.    DISPUTED TERM (U.S. PAT. NO. 10,571,101) ......................................19

        A.      "Insulating Layer of Insulating Material" ......................................19

        1.      Defendant's Proposed Construction..................................................20

        2.      Plaintiff's Proposed Construction ....................................................25

XIII.   DISPUTED TERM (U.S. PAT. NOS. 10,323,832 AND 10,465,888).........30

        A.      "Insulating Film"..............................................................................30

        1.      Defendant's Proposed Construction..................................................30

        2.      Plaintiff's Proposed Construction ....................................................35

XIV.    DISPUTED TERM (U.S. PAT. NOS. 10,920,971)....................................41

        A.      "A Ground-Anchorable Lower Housing" .........................................41

1.    Intrinsic and Extrinsic Evidence Supports Defendant's Construction 42

2.    The Intrinsic Record Does Not Support Plaintiff's Construction .....45

3.    The Accused Products Only Include a Conduit for Wires Below the Main Housing ........................................................................................49

XV.    CONCLUSION .................................................................................52

1.    I have been retained by Defendant Lumien Enterprise, Inc. d/b/a Lumien Lighting ("Lumien") in connection with this litigation.  I have been asked by counsel for Lumien to provide my opinions regarding a first disputed term of U.S. Patent No. 10,571,101 ("the '101 patent"), a second disputed term of U.S. Patent No. 10,920,971 ("the '971 patent"); and a third disputed term of both U.S. Patent No. 10,323,832 ("the '832 patent") and U.S. Patent No. 10,465,888 ("the '888 patent"), and in particular how a person of ordinary skill in the art ("POSITA") would understand these disputed term at the time the respective patents were filed. Additionally, I have been informed that U.S. Patent No. 10,598,358 ("the '358 patent") is asserted in this litigation; however, I have not been asked to provide my opinion for any disputed terms of this patent at this time.

## I.    BACKGROUND AND QUALIFICATIONS

2.    Since 2008, I have served as the President of TLC Display Consulting, which provides technical consulting in the field of flat panel displays, Light-Emitting Diodes ("LEDs"), optics and emerging LED technologies.  I have a Master's degree in electrical engineering from the Massachusetts Institute of Technology and have acquired over 40 years of experience in the field of LEDs and LED lighting.  Prior to my work with TLC Display Consulting, I served in executive capacities at numerous companies in connection with LEDs and LED lighting, particularly with

respect to display technologies.  For example, I served as the acting CEO for RealID, in which I provided business and technical advice to RealD's Intelligent Backlight Business Unit; the Vice President of Innova Dynamics, Inc., at which I was responsible for testing and qualification of all products; the senior Vice President of Engineering of Puredepth, Inc., at which I held leadership positions for hardware and software engineering related to Multi Layer Display (MLD) technology, particularly high brightness LED backlights; and the Vice President of Engineering at Clairvoyante, Inc., at which I was responsible for engineering and product development of technology to improve resolution and reduce power of color flat panel displays.  I was also a consultant at Display Engineering that designs and fabricates high brightness LED systems for use in outdoor applications. Responsibilities included both electrical (LED driving circuits) and mechanical (heat sinking and heat flow) designs. I am also listed as an inventor on over 80 U.S. patents in technologies including display design, display electronics, materials, algorithms, systems, RFID, and optics.  A more complete description of my education and experience is set forth in my current *curriculum vitae* ("CV") attached hereto as Appendix A.

## II.    MATERIALS CONSIDERED AND BASIS FOR MY OPINIONS

3.      My opinions and analysis set forth in this Declaration are based on my education, training, and experience as summarized above and detailed in my CV, as

well as my review of Exhibits A through AE of Defendant's Opening Claim Construction Brief, the '101, '971, '832, '888, and '358 patents and relevant file histories.

## III.   DESCRIPTION OF THE RELEVANT TIMEFRAME

4.     I have been advised that the earliest possible effective filing date for each of '101, '971, '832, and '888 patents is December 15, 2015 and have been asked to provide (and did provide) my opinions herein with respect to how a POSITA would understand the disputed terms on this date.  I have not analyzed and have no opinion on whether the December 15, 2015 priority claim is accurate.

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

5.     I have been asked to consider the level of ordinary skill in the field that someone would have had at the time the claimed inventions were made.  In deciding the level of ordinary skill, I considered the following:

- the levels of education and experience of persons working in the field;
- the types of problems encountered in the field; and
- the sophistication of the technology.

6.     It is my understanding that in the previous ITC Investigation, Respondents, including Lumien, contended that a POSITA would have a bachelor's degree in electrical and/or mechanical engineering and at least three years of relevant industry, research, or other experience related to LED lighting devices ("Relevant Experience"); or a general science degree and five or more years of such Relevant

Experience.  It is my understanding that this level of skill was opined on by Dr. Gary Allen in connection with a former proceeding before the United States Patent Office for post-grant review of the '101 patent.

7.     I have also been advised that in the previous ITC Investigation, Complainant Wangs Alliance Corporation, d/b/a WAC Lighting ("WAC," the Plaintiff in the present litigation in the Northern District of Georgia) contended that a POSITA would have a bachelor's degree in electrical and/or mechanical engineering and at least one to three years of relevant industry experience related the design, manufacture, and/or construction of LED lighting devices.

8.     Based on my review of the '101, '971, '832, and '888 patents and the materials identified above, and applying the principles described above in paragraph 5, it is my opinion that the relevant field applicable to the '101, '971, '832, and '888 patents is LEDs, LED light fixtures and luminaires and that Respondents' understanding of the appropriate level of ordinary skill is accurate, though the opinions I express herein are the same and equally applicable when applying WAC's understanding of the appropriate level of ordinary skill.

## V.     MY UNDERSTANDING OF CLAIM CONSTRUCTION

9.     I have been advised that words and terms appearing in the claims of a patent are to be construed in accordance with their ordinary and accustomed meanings, as understood by a POSITA at the time the patent was effectively filed

(in the case of the '101, '971, '832, and '888 patents, December 15, 2015), in view of the intrinsic record (*i.e.*, the claim language, specification and prosecution history of the patent), as well as extrinsic evidence (such as dictionaries and treatises) that may have a bearing on how a POSITA would understand such words and terms. I have applied this standard when rendering the opinions expressed herein.

## VI.   ASSERTED CLAIMS

10. I have been informed that WAC is asserting claims 1-6, 8-13, and 18 of the '101 patent, claims 1 and 7-9 of the '971 patent, claims 1-5, 9-10, 13, and 17-20 of the '832 patent, claims 1-5, 7, 9-15, 17-18, 20, 22-24, 26-28, and 30-32 of the '888 patent, and claims 1-19 of the '358 patent.

## VII.   AGREED-UPON CONSTRUCTIONS

11. I have been informed that the parties have agreed on constructions for the following terms appearing in the Asserted Claims of the '101, '971, '832, '888, and '358 patents ("the Asserted Patents"):

| Patents | Term | Agreed-Upon Construction |
|---|---|---|
| '101 | "a wall of the driver housing" (Claims 1, 11) | Plain and ordinary meaning |
| '101, '358, | "driver housing" ('101, Claims 1, 11; '358, Claim 14; '832, Claims 1, 17; '888, Claims 1, 9, 20) | an enclosure that contains the LED driver assembly and |

| Patents | Term | Agreed-Upon Construction |
|---|---|---|
| '832, '888 | | may include an enclosure cap |
| '101, '358, '832, '888 | "a circular seal" ('101, Claims 1, 11; '358, Claim 14; '832, Claim 17; '888, Claims 1, 9, 20) | a seal that is substantially round |
| '101, '832, '888 | "a resistor component with a rotatable control" ('101, Claims 1, 11;'832, Claim 17; '888, Claim 20) | a resistor assembly including a rotatable control |
| '101, '971, '358, '832, '888 | "a dimming control" ('101, Claims 1, 11; '971, Claims 1, 7; '358, Claim 14) "a dimming control knob" ('832, Claims 1, 17; '888, Claims 1, 9, 20) | an on-board mechanism for manually adjusting the brightness of the LED light source<br><br>an on-board knob for manually adjusting the brightness of the LED light source |
| '101, '358, '832, '888 | "coupled" ('101, Claims 1, 5, 11; '358, Claim 14; '832, Claims 1, 17; '888, Claims 1, 9, 20) | coupled electrically |
| '101, '832 | "covers" ('101, Claim 12)<br><br>"covering" ('832, Claims 1, 17) | extends over<br><br>extending over |
| '101 | "a tilt mechanism for changing the direction at which the light is emitted from the LED lighting device" (Claim 12) | Plain and ordinary meaning |

| Patents | Term | Agreed-Upon Construction |
|---|---|---|
| '971 | "an adjustable resistance component" (Claim 7) | a resistor assembly having an adjustable resistance |
| '358 | "said at least one angled slot extending at an angle from a lower portion of said sidewall to an upper portion of said sidewall" (Claims 1, 16, 19) | Plain and ordinary meaning |
| '358 | "wherein said LED light assembly further includes a locking screw with a shaft passing through a hole in the arm of the driver housing and extending into a screw hole in the arm secured to the fixture main body, said locking screw locking the arm secured to said fixture main body in position when tightened, preventing rotation of the arm secured to said fixture main body." (Claim 15) | Plain and ordinary meaning |
| '358 | "rotation of said arm secured to said fixture main body changing the direction from which light is emitted from the LED light assembly" (Claim 15) | Plain and ordinary meaning |
| '832, '888 | "a bottom surface of said recess in the bottom of said driver housing" ('832, Claims 2, 19; '888, Claims 2, 12) | Plain and ordinary meaning |
| '832, '888 | "said enclosure cap includes a threaded shaft extending from a bottom of said enclosure cap" ('832, Claim 3; '888, Claims 3, 13) | Plain and ordinary meaning |

| Patents | Term | Agreed-Upon Construction |
|---|---|---|
| '832 | "[t]he LED light base assembly of claim 1 further including a tilting mechanism secured to said driver housing and to a light fixture main body and a tilting mechanism lock screw" (Claim 10) | Plain and ordinary meaning |
| '101 | "bottom wall" (Claim 18) | Plain and ordinary meaning |
| '832 | "driver housing base portion" (Claim 1, 17) | Plain and ordinary meaning |
| '101, '832 | "a top portion of said LED driver assembly" ('101, Claims 1, 11; '832, Claims 1, 17) | Plain and ordinary meaning |
| '358, '832, '888 | "a rotatable control of the potentiometer" ('358, Claim 14; '832 Claim 1; '888, Claims 1, 9) | Plain and ordinary meaning |
| '358, '832, '888 | "the base portion of the driver housing includes a top portion including a flat surface" ('358, Claims 1, 16, 19)<br><br>"the driver housing base portion of the LED light base assembly includes a top portion including a flat surface" ('832, Claims 1, 17)<br><br>"the base portion of the driver housing of the LED light base assembly includes a top portion including a flat surface" ('888, Claim 1) | Plain and ordinary meaning |

| Patents | Term | Agreed-Upon Construction |
|---|---|---|
|  | "the base portion of the driver housing of the base assembly includes a top portion including a flat surface" ('888, Claims 9, 20) |  |
| '101 | "connected" (Claims 2, 12) | connected physically |
| '971 | "a slotted cylinder" (Claims 1, 9) | Plain and ordinary meaning |
| '971 | "a rotatable member of the adjustable resistance component" (Claim 8) | Plain and ordinary meaning |
| '832 | "a rear side" (Claim 1) | Plain and ordinary meaning |

## VIII.  DISPUTED TERMS

12.    I have been advised that the parties dispute eleven terms in total. I have been asked to provide opinions related to the three following disputed terms:

| Patent Number | Claim Number | Term | WAC's Proposed Construction | Lumien's Proposed Construction |
|---|---|---|---|---|
| '101 | 1, 11 | "an insulating layer of insulating material" | **a thickness of material that provides insulation** | **a single thickness of material that provides heat insulation** |
| '832 '888 | 1, 17 1, 9, 20 | "insulating film" | **a film of insulating material** | **a film of heat insulating material** |
| '971 | 1, 7, 9 | "ground anchorable lower housing" | Plain and ordinary meaning; | **a ground-anchorable lower body that contains** |

- 9 -

| | | | alternatively, **a ground-anchorable lower enclosure** | **an assembly of components** |
|---|---|---|---|---|
| | | | | |

## IX. SCOPE AND SUMMARY OF OPINIONS

13. I have been asked to provide my opinion regarding proper construction of i) the disputed term "an insulating layer of insulating material" ("the Insulating Layer Term"), as this term appears in independent claims 1 and 11 of the '101 patent, ii) the disputed term "insulating film," as this term appears in claims 1 and 17 of the '832 patent and claims 1, 9, and 20 of the '888 patent, and iii) the disputed term "ground anchorable lower housing," as this term appears in claims 1, 7, and 9 of the '971 patent. I was not asked to review any other disputed terms of the Asserted Patents.

14. Based on the above and my understanding of legal principles as explained to me (*see* Section V above), it is my opinion that Lumien's proposed construction of the Insulating Layer Term is correct and accurately reflects how a POSITA would understand this term in view of the intrinsic and extrinsic record of the '101 patent at the time the '101 patent was effectively filed. It is also my opinion that WAC's proposed construction of the Insulating Layer Term is inconsistent with intrinsic and extrinsic evidence and does not comport with how a POSITA would understand this term.

15. Based on the above and my understanding of legal principles as explained to me (*see* Section V above), it is also my opinion that Lumien's proposed construction of "insulating film" is correct and accurately reflects how a POSITA would understand this term in view of the intrinsic and extrinsic record of the '832 and '888 patents at the time each was effectively filed. It is also my opinion that WAC's proposed construction of "insulating film" is inconsistent with intrinsic and extrinsic evidence and does not comport with how a POSITA would understand this term.

16. Based on the above and my understanding of legal principles as explained to me (*see* Section V above), it is also my opinion that Lumien's proposed construction of "ground anchorable lower housing," is correct and accurately reflects how a POSITA would understand this term in view of the intrinsic and extrinsic record of the '971 patent at the time the '971 patent was effectively filed. It is also my opinion that WAC's proposed construction of the "ground anchorable lower housing," is inconsistent with intrinsic and extrinsic evidence and does not comport with how a POSITA would understand this term.

## X.    OVERVIEW OF THE ASSERTED PATENTS

17. The Asserted Patents are directed to above-ground and in-ground embodiments of LED lighting devices, such as those used to accent statues, trees and

other features of a landscape. Ex. A at Abstract, 6:63 to 7:3.[1] A primary above-ground embodiment of the Asserted Patents provides a waterproof LED landscape light 100 having an upper LED light assembly 533 and a LED light base assembly 565 in a standard articulated configuration, as shown below. *Id*. at 7:4-19; FIGS. 1, 5.



*Id*., FIG. 1.

18.     Upper assembly 533 includes, among other things, a fixture main body 532 housing a standard LED light source 528 and a beam angle control dial 510 for adjusting the angle of projected light. *Id*. at 5:49-64; 6:45-47; FIG. 1.  Base assembly 565 includes a driver housing 540 enclosing circuitry for driving the light source

---

[1] The exhibits referred to herein are those attached to Lumien's Opening *Markman* Brief. Citations in this section refer to the '101 patent; however, each of the asserted patents shares an almost identical specification and claims the benefit of the same priority documents. Specifically, the '832, '888, '101, '971, and '358 patents each claim the benefit of U.S. Provisional Patent App. Nos. 62/280,114, filed on January 18, 2016; 62/270,517, filed on December 21, 2015; 62/269,751, filed on December 18, 2015; and 62/267,899, filed on December 15, 2015.

528, a securing nut 564 for securing light assembly 100, and a tilting mechanism 536 (with articulated arms) to adjust the angle of upwardly projected light. *Id*. at 19:15-49; 25:20-22; 25:63 to 26:4; FIG. 6B.

19.     Driver housing 540 includes a compartment for containing an LED driver assembly 554 having a driver circuit board, on which is mounted standard LED driver circuitry. *Id*. at 24:50 to 25:12; 40:29-33; FIGS. 30-31.  An "insulating" material (*i.e.*, film 552) is "positioned between the driver assembly 554 and driver housing surface 551 [*i.e.*, the inside ceiling of the driver housing, also referred to in the claims as the "flat bottom surface"]" for "providing heat insulation for the driver that is the driver circuit of the driver assembly 554." *Id*. at 24:39-49.  A dimming control knob 548 extends through a "control knob opening" of driver housing 540 where it engages with the driver circuitry. *Id*. at 20:64-65; 26:34-58.   User rotation of knob 548 (which is coupled via a shaft to a rotatable control of a potentiometer) adjusts the brightness of LED light source 528. *Id*. at 20:62 to 21:26; 26:39-41; 40:35-43; FIGS. 1, 6B.  Below is a modified and annotated version of Figure 36 showing these features.



FIG. 36

*Id.*, FIG. 36 (annotated).

20.    The Asserted Patents also disclose what appears to be a single in-ground light fixture identified with different reference numerals 2000, 2200, 2300, 2800, 3200 comprising, *inter alia*, a fixture housing 2338 and an upper fixture main body 2332 positioned within and supported by housing 2338.  *Id.* at 31:1 to 37; 32:35-38; 33:24-52.  Upper fixture main body 2332 includes a moveable light assembly 2313 with an LED light source 2324 and a driver assembly 2336 for driving LED light source 2324.

21.    Various housings and brackets of disclosed embodiments are described as being formed as one piece from "cast aluminum."  *Id.* at 10:28-30

(fixture main body 532); 32:61-64 (upper fixture main body 2330); 33:24-26 (fixture main body 2332).

22.     Various embodiments include structures for waterproofing or sealing the embodiments from dirt and water.  These structures include, *e.g.*, various gaskets, "potting," "O-rings," "sealing glass" and "sealing glue[s]," all of which are described as "sealing," "waterproofing" or "protecting" landscape light 100 from intrusion of water and foreign contaminants.  For instance, sealing glue, potting and various O-rings, flexible seals, sealing glass and flat or custom shaped gaskets 508, 522, 530, 534, 538, 550, 558, 563, 1618, 1626, 2308 are described as "sealing said top opening . . . of the driver housing" (Ex. A at 2:32-35); "protecting the light fixture from the intrusion of water and dirt thereby providing a water proof or water resistant fixture which is also resistant to dirt" (*id*. at 6:51-58); "protect[ing] the light fixture from environmental conditions such as the entry of water and/or dirt that may damage the internal components of the upper light assembly 533" (*id*. at 8:36-40); "seal[ing] the lens assembly from entry of water and dirt" (*id*. at 10:24-27); "seal[ing] the hole or opening in the upper driver housing 540A through which the screw passes sealing it from entry of water and dirt" (*id*. at 11:7-11); "provid[ing] a watertight seal" (*id*. at 12:6-10); "seal[ing] between the inside surface of the wall of the cylindrical beam angle changing dial 510 and the outer surface of the top portion 535 of the fixture main body 532" (*id*. at 12:28-36; *see also id*. at 13:18-26);

- 15 -

"seal[ing] the LED light base assembly from water intrusion" (*id*. at 19:58-62); "seal[ing] and prevent[ing] the intrusion of water between the tilting mechanism assembly 536 and the fixture main body 532" (*id*. at 20:9-12); "seal[ing] an opening in the tilting mechanism through which the tilting mechanism lock screw extends from the intrusion of water as well as the opening through which wires 578 extend" (*id*. at 20:34-38); "seal[ing] between the dimming control knob 548 and the driving housing 540" (*id*. at 23:32-34); "seal[ing] the driver housing 540 to prevent the intrusion of water and/or dirt through the top opening through which the wires 578 extend" (*id*. at 24:12-15); "seal[ing] the wire openings from the intrusion of water and dirt" (*id*. at 24:33-34); "seal[ing] the driver housing 540 from intrusion of water" (*id*. at 25:28-30); "seal[ing] said opening through which the light fixture power supply wires 576 extend from water entry" (*id*. at 25:46-50); "stabiliz[ing], secur[ing] and waterproof[ing] the driver assembly 554 within the cavity of the driver housing 540" (*id*. at 25:58-62); "provid[ing] a watertight seal while still allowing the knob 548 to rotate" (*id*. at 26:47-50); "prevent[ing] the intrusion of water and dirt into the fixture main body 1628 protecting the components inside including the LED 1624" (*id*. at 30:1-3); and "seal[ing] the top of the fixture housing" (*id*. at 35:25-27).  None of these structures are described in the Asserted Patents as insulators or insulating materials.

## XI.  RELEVANT PROCEDURAL FACTS

23.    I have been informed of the following procedural history relevant to this Investigation.

24.    On March 8, 2021, WAC filed a Public Complaint with the International Trade Commission (the "ITC") naming five respondents, including Lumien, and alleging that certain LED landscape lighting devices imported by these respondents infringed either or both of the '101 and '971 patents. *See generally* Certain LED Landscape Lighting Devices and Components Thereof, Inv. No. 337-TA-1261 (Int'l Trade Comm'n Mar. 8, 2021)(the "ITC Investigation"). The disputed terms were fully briefed, followed by the filing of an Updated Joint Claim Construction Chart on August 25, 2021. *See generally* Ex. AA. For the '101 patent, the Joint Claim Construction Chart identified, *inter alia*, the disputed terms of "a driver housing includes an upper portion including a flat bottom surface [and] a lower portion," and "an insulating layer of insulating material." *Id*. at 4-5. For the '971 patent, the Joint Claim Construction Chart identified, *inter alia*, the disputed terms of "from outside the monolithic upper housing [by a dimming control]," and "a ground-anchorable lower housing." *Id*. at 7, 9. A *Markman* hearing was conducted on August 18, 2021; however, a *Markman* order was never issued because each of the participating respondents terminated the case through consent order or settlement, leaving only defaulting respondents remaining.

25.    Prior to the institution of the ITC Investigation, WAC filed a patent infringement suit in New Jersey on April 6, 2020 against CAST Lighting LLC ("CAST"), one of the respondents named in the ITC Investigation, alleging patent infringement of the '101 patent.  *See generally Wangs Alliance Corp. d/b/a WAC Lighting Co. v. CAST Lighting LLC*, No. 2:20-cv-03710-MCA-MAH, ECF. No. 1 (D.N.J.            Apr.            6,            2020) (the "NJ Litigation").    On November 23, 2020, the parties filed a Joint Claim Construction Statement identifying proposed constructions of disputed terms, including the term "insulating layer of insulating material" at issue in this Investigation.  *See generally* Ex. K.  The parties thereafter fully briefed the disputed terms.  *See Wangs Alliance Corp.*, No. 2:20-cv-03710-MCA-MAH, ECF Nos. 39, 40.  On March 15, 2021, upon stipulation of the parties, the NJ Litigation was stayed pending resolution of this Investigation.  *See id.*, ECF No. 56.  Following CAST's settlement in the ITC Investigation, the parties agreed and stipulated to dismiss the NJ Litigation with prejudice before a *Markman* hearing was conducted. *See id.*, ECF No. 58, 59.

26.    While the NJ Litigation was ongoing, CAST filed a petition with the PTAB on November 24, 2020 seeking post-grant review and invalidation of all claims 1-20 of the '101 patent based primarily on the Philips Flexscape BL9 Landscape Luminaire ("BL9")—one of the primary prior art references asserted

against the '101 patent in the current litigation between WAC and Lumien. *See generally CAST Lighting LLC v. WAC Lighting Co.*, Case No. PGR2021-00012, paper 2 (P.T.A.B. Nov. 24, 2020) ("the PGR Proceeding"). On March 10, 2021, WAC filed a Preliminary Response arguing against institution of review and for constructions of various claim terms, including the term "driver housing includes an upper portion including a flat bottom surface [and] a lower portion" at issue in this Investigation. *See* Ex. M at 18-22. On April 4, 2021, CAST filed a Preliminary Reply in support of its petition. *See* Ex. U. On April 19, 2021, WAC filed a Preliminary Sur-Reply in further support of its arguments and proposed constructions. *See* Ex. O at 3-4. On June 7, 2021, the PTAB instituted review of the '101 patent finding that CAST's petition demonstrates that at least one claim of the '101 patent is "more likely than not" invalid over the BL9 and other art. *See* Ex. N at 27. WAC and CAST reached a confidential joint settlement agreement, and the PTAB granted the parties' Joint Motion to Terminate the proceeding, thereby concluding the proceeding. *See* Ex. S.

## XII.   DISPUTED TERM (U.S. PAT. NO. 10,571,101)

### A.   "Insulating Layer of Insulating Material"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| **a thickness of material that provides insulation** | **a single thickness of material that provides heat insulation** |

27.    I have been informed that Defendant contends that the term "insulating layer of insulating material" ("the Insulating Layer Term") should be construed to mean "a single thickness of material that provides heat insulation."  I have also been informed that Plaintiff contends that the Insulating Layer Term should be construed to mean "a thickness of material that provides insulation."

28.    In my opinion, Defendant's proposed construction of the Insulating Layer Term is correct and accurately reflects how a POSITA would understand this term in view of the intrinsic and extrinsic records of the '101 patent at the time the '101 patent was effectively filed.  It is also my opinion that Plaintiff's proposed construction of the Insulating Layer Term is inconsistent with intrinsic and extrinsic evidence and does not comport with how a POSITA would understand this term.

### 1.    Defendant's Proposed Construction

29.    Based on my review of the '101 patent, I note that the word "insulating," as recited twice in the Insulating Layer Term, was not used in the patent to refer generally to any form of insulation, but instead refers to only a specific type of insulating material to address a specific concern of heat and, particularly, potential damage that excessive heat may cause to driver electronics.  The '101 patent describes insulating materials as follows:

> Returning once again to elements of the light fixture base assembly 565, the LED light base assembly 565 also includes an insulating film 552. The insulating film 552 in some embodiments is made of VO rated plastic. *The insulation film 552 provides heat insulation for the driver*

- 20 -

*that is the driver circuit of the driver assembly 554.* The insulation film 552 is positioned between the driver assembly 554 and driver housing surface 551 of driving housing 540. The insulating film 552 covers the top portion of the LED driver assembly 554 and a bottom surface of the top portion of the LED driver housing 540.

Ex. A at 24:39-49 (emphasis added).

30.    Nowhere in the '101 patent is "insulating" or "insulation" used to identify or suggest any type of insulating material other than materials that protect against heat.  A POSITA would therefore understand that thermal insulation is the only form of insulation that was a concern in the '101 patent.  Notably, the only material identified in the '101 patent as "insulating" (*i.e.*, film 552) is described as "provid[ing] heat insulation for the driver that is the driver circuit of the driver assembly 554."  *Id*. at 24:39-49.  The specific heat protective material being discussed (film 552) is also referred to universally throughout the patent as an "insulating" film 552 without a "heat" prefix. Within this context, a POSITA would understand "insulating" standing by itself without any other modifier to indicate only heat protective materials, since this addresses the specific (and only) concern of heat identified in the patent.  *See id*. 24:39-49; 19:28-30; 20:55-56; 27:18-20 (referring to heat protective material as "insulating" film 552).

31.    Nor would it be uncommon for a POSITA to use "insulating" by itself to refer to only heat protective insulating materials.  From my years of experience working in the field of LED lighting and panel displays and my general knowledge

- 21 -

of the relevant industries, it is common (and was common at the time the '101 patent was filed) for engineers, POSITAs and others to use "insulating" and other forms of this word to identify only those types of insulating materials relevant to particular concerns such materials were intended to address.  This is not surprising, as engineers, POSITAs and others in most contexts would not be expected to use "insulating" in its general sense, given the varying different purposes for and characteristics of different insulating materials.  For instance, when designing circuits for LED drivers, it is not uncommon for engineers, POSITAs and others to refer to electrical insulation (such as that used on a circuit board, part of an LED substrate, or on wires and/or leads) as "insulation" by itself and without an "electrical" modifier.  In such cases, the type of insulation is generally communicated via the context of the discussion itself.  For example, a discussion among engineers concerning the desire to protect electronics from short circuits would convey the type of "insulation" being referred to; namely, electrical insulation.  Whereas a discussion among engineers, POSITAs or others concerning the desire to protect electronics from heat would provide context for an entirely different form of "insulation," (heat insulation) without the need for a "heat" modifier.  This is consistent even with everyday usage of "insulation," such as when one may communicate to another a need to place "insulation" or "fiberglass insulation" in the walls of a home to protect from winter cold.

- 22 -

32.    Consistent with this common practice in the field and the context within which the word "insulating" was used in the '101 patent, a POSITA would understand the word "insulating" as used in the '101 patent to identify only heat protective materials, consistent with Defendant's proffered construction of the Insulating Layer Term.

33.    This is further evidenced by the '101 patent claims, which place the "insulating layer of insulating material" in a specific position consistent with where a POSITA would be expected to place a heat protective material for addressing the stated concern of heat.   As described in the specification, the purpose of the insulating material is to "provide[] heat insulation for the driver that is the driver circuit of the driver assembly 554." Ex. A at 24:42-44. The patent does not expressly identify what source of heat is a concern, but a POSITA would recognize that the LED light source in the fixture main body may be a significant source of heat, especially on or about December 15, 2015 (the earliest effective filing date of the '101 patent) when LED lights were less efficient (and, thus, generated more heat) compared to those of today.   In such a circumstance, and given that the relevant driver housings described in the '101 patent are compact and, thus, appear to have lower than optimal outer surface areas for dissipation of heat to the environment, a POSITA would find it sensible to place a heat protective layer "between the flat bottom surface of the upper portion of the driver housing and the top portion of the

- 23 -

LED driver assembly," as recited in claims 1 and 11 and as shown in the patent Figures, as doing so would at least partially protect the driver assembly from heat generated by the LED light in the fixture main body that is conducted downwardly through the tilt mechanism and into the driver housing.



*See* Ex. A at FIGS. 1, 36 (annotated in the above).  A POSITA would recognize that this is particularly relevant with respect to embodiments in which the fixture main body is made from heat conductive aluminum for the express purpose of dissipating heat generated by the LED light. *See id.* at 10:28-30.

34.    Finally, I note that all parities contend that the Insulating Layer Term should be construed to encompass a "thickness of material . . . .," but Defendant contends that the term should be construed as a "single" thickness of material. Without the "single" modifier, it appears that the Insulating Layer Term would

encompass any thickness or form of material, regardless of whether such material is formed into a "layer" as required by the claims. Defendant's "single" modifier gives meaning to the word "layer" and is consistent with the specification of the '101 patent, which discloses a uniform-thickness film 552. In my opinion, this is how a POSITA would understand the "insulating layer" phrase of the Insulating Layer Term.

### 2.    Plaintiff's Proposed Construction

35.    Plaintiff proposes that the Insulating Layer Term should be construed to mean "a thickness of material that provides insulation." Plaintiff's construction appears to allow the term to embrace any conceivable form of insulation, despite the '101 patent's limited use of the term and the word "insulating" to refer to only heat protective materials. In my opinion, a POSITA would not ascribe such a broad definition to the Insulating Layer Term within the context of the '101 patent.

36.    For example, sound insulation is nowhere discussed in the '101 patent and obviously has no relevance at all to the light fixtures discussed therein. Likewise, although a POSITA would understand electrical insulation generally to be a consideration in the design of any electric device (such as a light fixture), the '101 patent presents no discussion concerning electrical insulation. As such, there is nothing in the intrinsic record from which a POSITA would conclude that the Insulating Layer Term refers to sound or electrically insulating materials.

37.    Moreover, based on the specification of the '101 patent, a POSITA would not understand the word "insulating" to refer to water sealing or water-proofing materials, such as potting, gaskets, sealing glues, and other water protecting structures disclosed in the '101 patent.  Potting and other water-proofing materials are described at different sections of the patent using different, conventional terms, such as "seal[ing]," "waterproof[ing]," "protect[ing] from water and dirt entry" and the like.  *See, e.g.*, Ex. A at Abstract ("water tight seals which also protect against dirt."); 2:24-26 ("seal providing a watertight seal"); 6:55-57 ("seal or seals protecting the light fixture from the intrusion of water and dirt thereby providing a water proof or water resistant fixture."); 10:36-38 ("a sealant such as for example a silicone material that seals and protects the light source 528 from water and dirt."); 15:4-5 (" water tight seals and protections against water and dirt intrusion."); 20:2-3 ("use of seals which seal and protect against the intrusion of water and dirt."). The '101 patent uses these different terms to describe potting, other water-proofing materials, and their characteristics, while never using "insulating" or "insulation" to do so.  A POSITA, therefore, would not understand "insulating" or "insulation" as referring to water sealing structures/materials or their characteristics.

38.    The claims themselves also use different words to describe water sealing and insulating, further establishing that the two would be understood by a POSITA as referring to different things within the context of the '101 patent.  For

- 26 -

instance, independent claims 1 and 11 recite a "circular seal" in addition to the "insulating layer of insulating material." *See* Ex. A at 50:25-26, 31-33, 42-43; 51:23-24, 29-31, 39-41. Yet, the seal is not described in the claims as providing "water insulation," but rather as "*sealing* between the dimming control and the driver housing." *Id*. at 50:31-33; 51:29-31 (emphasis added). Dependent claims 10 and 12 further limit the "circular seal" to "provid[ing] a water tight seal" (*see id*. at 51:7-9; 52:6-7), again evidencing that a POSITA would understand sealing/waterproofing and "insulating"/"insulation" as referring to different concepts both in the specification and claims of the '101 patent.

39.     Plaintiff's construction also appears inconsistent with other language of the '101 patent claims. As I note above, the claimed "insulating layer of insulating material" is positioned on only the top side of the LED driver "between the flat bottom surface of the upper portion of the driver housing and the top portion of the LED driver assembly." *See* Ex. A at 50:42-45; 51:39-43; FIGS. 6B, 36. If the Insulating Layer Term encompasses any conceivable form of insulation, such as electrical insulation, potting and other water sealing structures (as apparently urged by Plaintiff), it would make little sense to claim such materials on only one side of the LED driver assembly, leaving components on the other side exposed and unprotected, since if even one side is left exposed the entire driver assembly could potentially be compromised. It makes even less sense for the claims to single out

the top side of the LED driver assembly for protection, as opposed to the lower side which, in all disclosed embodiments, includes the vast majority of electrical components. *See, e.g.*, FIGS. 5, 6B, 16 (showing LED driver assembly 554 having almost all components mounted to the lower side of the circuit board).  It makes sense to place an "insulating layer of insulating material" on only the top side of the LED driver assembly if the layer is a heat protective material for shielding the assembly from heat generated by the LED light above it.  This is how a POSITA would understand the Insulating Layer Term and the claims of the '101 patent.

40.     There are other reasons why a POSITA would not expect an electrically insulative layer to be placed on only the top side of the LED driver assembly.  The LED driver assembly is described in the '101 patent as mounted to the bottom of the driver housing, with no electrical contacts of components touching or coming close to the top of the driver housing.  *See* Ex. A at 25:13-19; FIGS. 6B, 36.  As shown in the annotated figure below, components make electrical contact with the LED driver circuit board at a position separated by a large air gap from the driver housing top.



FIGURE 36

Ex. A at FIG. 36 (annotated). Short circuits are even less likely, as the disclosed embodiments (and small outdoor/household LED light fixtures in general) typically operate at voltages (*e.g.*, 9V to 15V) insufficient to cause substantial arcing of electric current across the air gap or even from surfaces of components that may sit adjacent to the top of the driver housing. *See* Ex. A at 6:14-51; 31:40-43; 40:20-28. As such, there does not appear to be much need for an electrically insulative layer of material in the claimed position "between the flat bottom surface of the upper portion of the driver housing and the top portion of the LED driver assembly" (*see* claims 1 and 11 of the '101 patent). A POSITA would, therefore, not understand the Insulating Layer Term as covering electrically insulative materials.

41.     Even if a layer of electrically insulative material were necessary to prevent shorts to the top of the driver housing (which is neither an expressed concern of nor otherwise clear from the disclosure of the '101 patent), a POSITA would

- 29 -

recognize that short circuits are more (or at least equally) likely to occur on the driver assembly's bottom side, on which are mounted a majority of the assembly's components cradled by and coupled to the housing via a mounting bracket 556. *See* Ex. A at 25:13-19; 25:66 to 26:4; FIGS. 5, 6B, 36. The failure of the claims to address the bottom side of the LED driver assembly signals to a POSITA that the Insulating Layer Term covers something other than electrically insulative materials; in the case of the '101 patent, heat protective materials.

## XIII. DISPUTED TERM (U.S. PAT. NOS. 10,323,832 AND 10,465,888)

### A. "Insulating Film"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| **a film of insulating material** | **a film of heat insulating material** |

42.    I have been informed that Defendant contends that the term "insulating film" should be construed to mean "a film of heat insulating material." I have also been informed that Plaintiff contends that "insulating film" should be construed to mean "a film of insulating material."

43.    In my opinion, Defendant's proposed construction of "insulating film" is correct and accurately reflects how a POSITA would understand this term in view of the intrinsic and extrinsic records of the '832 and '888 patents at the time that the respective patents were effectively filed. It is also my opinion that Plaintiff's proposed construction of "insulating film" is inconsistent with intrinsic and extrinsic evidence and does not comport with how a POSITA would understand this term.

### 1.    Defendant's Proposed Construction

44.    Based on my review of the '832 and '888 patents, I note that the word "insulating," was not used in the patent to refer generally to any form of insulation, but instead refers to only a specific type of insulating material to address a specific concern of heat and, particularly, potential damage that excessive heat may cause to driver electronics.    The '832 and '888 patents describe insulating materials as follows:

> Returning once again to elements of the light fixture base assembly 565, the LED light base assembly 565 also includes an insulating film 552. The insulating film 552 in some embodiments is made of VO rated plastic. *The insulation film 552 provides heat insulation for the driver that is the driver circuit of the driver assembly 554.* The insulation film 552 is positioned between the driver assembly 554 and driver housing surface 551 of driving housing 540. The insulating film 552 covers the top portion of the LED driver assembly 554 and a bottom surface of the top portion of the LED driver housing 540.

Ex. X at 24:32-42 (emphasis added).[2]

45.    Nowhere in the '832 and '888 patents is "insulating" or "insulation" used to identify or suggest any type of insulating material other than materials that protect against heat.    A POSITA would therefore understand that thermal insulation is the only form of insulation that was a concern in the '832 and '888 patents. Notably, the only material identified in the '832 and '888 patents as "insulating" is

---

[2] Section XIII cites only to the '832 patent for convenience and clarity, unless citing to excerpts specific to the '888 patent, such as the claim language.

insulating film 552, which is described as "provid[ing] heat insulation for the driver that is the driver circuit of the driver assembly 554." *Id.* at 24:32-42. The specific heat protective material being discussed (film 552) is also referred to universally throughout the patent as an "insulating" film 552 without a "heat" prefix. Within this context, a POSITA would understand "insulating" standing by itself without any other modifier to indicate only heat protective materials, since this addresses the specific (and only) concern of heat identified in the patent. *See id.* 24:32-42; 19:22-24; 20:49-50; 27:11-13 (referring to heat protective material as "insulating" film 552). More specifically, because the sole discussion of insulation pertains to heat insulation provided by the insulating film 552, a POSITA would understand "insulating film" as used in the '832 and '888 patents to refer to a film comprised of heat insulating materials, even without expressly indicating "heat insulation film."

46.    To this point, it would not be uncommon for a POSITA to use "insulating" by itself to refer to only heat protective insulating materials. From my years of experience working in the field of LED lighting and panel displays and my general knowledge of the relevant industries, it is common (and was common at the time the '832 and '888 patents were filed) for engineers, POSITAs and others to use "insulating" and other forms of this word to identify only those types of insulating materials relevant to particular concerns such materials were intended to address. This is not surprising, as engineers, POSITAs and others in most contexts would not

be expected to use "insulating" in its general sense, given the varying different purposes for and characteristics of different insulating materials. For instance, when designing circuits for LED drivers, it is not uncommon for engineers, POSITAs and others to refer to electrical insulation (such as that used on a circuit board, part of an LED substrate, or on wires and/or leads) as "insulation" by itself and without an "electrical" modifier. In such cases, the type of insulation is generally communicated via the context of the discussion itself. For example, a discussion among engineers concerning the desire to protect electronics from short circuits would convey the type of "insulation" being referred to; namely, electrical insulation. Whereas a discussion among engineers, POSITAs or others concerning the desire to protect electronics from heat would provide context for an entirely different form of "insulation," (heat insulation) without the need for a "heat" modifier. This is consistent even with everyday usage of "insulation," such as when one may communicate to another a need to place "insulation" or "fiberglass insulation" in the walls of a home to protect from winter cold.

47.     Consistent with this common practice in the field and the context within which the word "insulating" was used in the '832 and '888 patents, a POSITA would understand the word "insulating" as used in the '832 and '888 patents to identify only heat protective materials, and more specifically, "insulating film" to identify a

film of heat protective materials, consistent with Defendant's proffered construction of "insulating film."

48.    This is further evidenced by the claims of the '832 and '888 patents, which place the "insulating film" in a specific position consistent with where a POSITA would be expected to place a heat protective material for addressing the stated concern of heat.    As described in the specification, the purpose of the insulating material is to "provide[] heat insulation for the driver that is the driver circuit of the driver assembly 554." Ex. X at 24:35-37. The patent does not expressly identify what source of heat is a concern, but a POSITA would recognize that the LED light source in the fixture main body may be a significant source of heat, especially on or about December 15, 2015 (the earliest effective filing date of the '832 and '888 patents) when LED lights were less efficient (and, thus, generated more heat) compared to those of today.    In such a circumstance, and given that the relevant driver housings described in the '832 and '888 patents are compact and, thus, appear to have lower than optimal outer surface areas for dissipation of heat to the environment, a POSITA would find it sensible to place a heat protective layer "between a bottom surface of the top portion of the LED driver housing and the top portion of said LED driver assembly," as recited in claims 1 and 17 of the '832 patent, or "between the top portion of the driver housing and the LED driver assembly," as recited in claims 1, 9, and 20 of the '888 patent, and as shown in the

- 34 -

patent Figures. Doing so would at least partially protect the driver assembly from heat generated by the LED light in the fixture main body that is conducted downwardly through the tilt mechanism and into the driver housing.



FIGURE 36

*See* Ex. X at FIGS. 1, 36 (annotated in the above).  A POSITA would recognize that this is particularly relevant with respect to embodiments in which the fixture main body is made from heat conductive aluminum for the express purpose of dissipating heat generated by the LED light. *See id.* at 10:22-24.

49.    In my opinion, the Defendant's proposed construction accurately reflects how a POSITA would understand the "insulating layer" phrase as used in the '832 and '888 patents.

### 2.    Plaintiff's Proposed Construction

50.    Plaintiff proposes that "insulating film" should be construed to mean "a film of heat insulating material."  Plaintiff's construction appears to allow the term

to embrace any conceivable form of insulation, despite the '832 and '888 patents' limited use of the term and the word "insulating," and more specifically, "insulating film," to refer to only heat protective materials.  In my opinion, a POSITA would not ascribe such a broad definition to "insulating film" within the context of the '832 and '888 patents.

51.    For example, sound insulation is nowhere discussed in the '832 and '888 patents and obviously has no relevance at all to the light fixtures discussed therein.  Likewise, although a POSITA would understand electrical insulation generally to be a consideration in the design of any electric device (such as a light fixture), the '832 and '888 patents present no discussion concerning electrical insulation.  As such, there is nothing in the intrinsic record from which a POSITA would conclude that the "insulating film" refers to sound or electrically insulating materials.

52.    Moreover, based on the specification of the '832 and '888 patents, a POSITA would not understand the word "insulating" to refer to water sealing or water-proofing materials, such as potting, gaskets, sealing glues, and other water protecting structures disclosed in the '832 and '888 patents. Potting and other water-proofing materials are described at different sections of the patent using different, conventional terms, such as "seal[ing]," "waterproof[ing]," "protect[ing] from water and dirt entry" and the like.  *See, e.g.*, Ex. X at Abstract ("water tight seals which

- 36 -

also protect against dirt."); 2:19-21 ("seal providing a watertight seal"); 6:49-51 ("seal or seals protecting the light fixture from the intrusion of water and dirt thereby providing a water proof or water resistant fixture."); 10:30-32 ("a sealant such as for example a silicone material that seals and protects the light source 528 from water and dirt."); 14:63-64 (" water tight seals and protections against water and dirt intrusion."); 19:63-64 ("use of seals which seal and protect against the intrusion of water and dirt."). The '832 and '888 patents use these different terms to describe potting, other water-proofing materials, and their characteristics, while never using "insulating" or "insulation" to do so. A POSITA, therefore, would not understand "insulating" or "insulation" (much less "insulating film") as referring to water sealing structures/materials or their characteristics.

53.    The claims themselves also use different words to describe water sealing and insulating, further establishing that the two would be understood by a POSITA as referring to different things within the context of the '832 and '888 patents. For instance, independent claims 1 and 17 of the '832 patent each recite "said seal providing a water tight seal" in addition to the "insulating film," and independent claims 1, 9, and 20 of the '888 patent each recite "said circular seal sealing between the dimming control knob and the base portion of the driver housing," in addition to the "insulating film." *See* Ex. X at 50:15-16, 24; 52:7-8, 15; Ex. Y at 50:17-18, 24; 51:6-8, 14; 52:18-20, 26. Yet, the seal is not described in the

claims as providing "water tight insulation," or "said circular seal insulating . . ." but rather as providing a "*seal*" or "*sealing* between the dimming control and the driver housing." *See* Ex. X at 50:15-16; 52:7-8; Ex. Y at 50:17-18; 51:6-8; 52:18-20 (emphasis added). The dependent claims of the '832 and '888 patents further make clear that sealing/waterproofing and "insulating"/"insulation" refer to entirely different concepts both in the specification and claims of the '832 and '888 patents. *See e.g.* Ex. X at 50:52-55 ("said sealing glue providing water proofing of said driver assembly in addition to the water proofing provided by the use of said seal and bottom gasket."); 51:9-12 ("a second tilting mechanism gasket positioned . . . to seal said tilting mechanism from entry of water."); Ex. Y at 50:42-44 ("said sealing glue sealing said opening . . . from entry of water or dirt."); 50:48-51 ("the sealing glue . . . which acts as a potting material . . . and which stabilizes, secures and waterproofs said LED driver assembly.").

54. Plaintiff's construction also appears inconsistent with other language of the '832 and '888 patents. As I note above, the claimed "insulating film" is positioned on only the top side of the LED driver "between a bottom surface of the top portion of the LED driver housing and the top portion of said LED driver assembly," as recited in claims 1 and 17 of the '832 patent, or "between the top portion of the driver housing and the LED driver assembly," as recited in claims 1, 9, and 20 of the '888 patent. *See* Ex. X at FIGS. 6B, 36. If the "insulating film"

encompasses any conceivable form of insulation, such as electrical insulation, potting and other water sealing structures (as apparently urged by Plaintiff), it would make little sense to claim such materials on only one side of the LED driver assembly, leaving components on the other side exposed and unprotected, since if even one side is left exposed the entire driver assembly could potentially be compromised. It makes even less sense for the claims to single out the top side of the LED driver assembly for protection, as opposed to the lower side which, in all disclosed embodiments, includes the vast majority of electrical components. *See, e.g.*, FIGS. 5, 6B, 16 (showing LED driver assembly 554 having almost all components mounted to the lower side of the circuit board). However, it makes sense to place an "insulating film" on only the top side of the LED driver assembly if the layer is a heat protective material for shielding the assembly from heat generated by the LED light above it. This is how a POSITA would understand the "insulating film" and the claims of the '832 and '888 patents.

55.    There are other reasons why a POSITA would not expect an electrically insulative layer to be placed on only the top side of the LED driver assembly. The LED driver assembly is described in the '832 and '888 patents as mounted to the bottom of the driver housing, with no electrical contacts of components touching or coming close to the top of the driver housing. *See* Ex. X at 25:6-12; FIGS. 6B, 36. As shown in the annotated figure below, components make electrical contact with

the LED driver circuit board at a position separated by a large air gap from the driver housing top.



FIGURE 36

Ex. X at FIG. 36 (annotated).  Short circuits are even less likely, as the disclosed embodiments (and small outdoor/household LED light fixtures in general) typically operate at voltages (*e.g.*, 9V to 15V) insufficient to cause substantial arcing of electric current across the air gap or even from surfaces of components that may sit adjacent to the top of the driver housing.  *See* Ex. X at 6:4-41; 31:28-31; 40:11-19.  "between a bottom surface of the top portion of the LED driver housing and the top portion of said LED driver assembly," as recited in claims 1 and 17 of the '832 patent, or "between the top portion of the driver housing and the LED driver assembly," as recited in claims 1, 9, and 20 of the '888 patent.  A POSITA would, therefore, not understand the "insulating film" as covering electrically insulative materials.

56.     Even if a layer of electrically insulative material were necessary to prevent shorts to the top of the driver housing (which is neither an expressed concern of nor otherwise clear from the disclosure of the '832 and '888 patents), a POSITA would recognize that short circuits are more (or at least equally) likely to occur on the driver assembly's bottom side, on which are mounted a majority of the assembly's components cradled by and coupled to the housing via a mounting bracket 556.  *See* Ex. X at 25:6-12; 25:59-64; FIGS. 5, 6B, 36.  The failure of the claims to address the bottom side of the LED driver assembly signals to a POSITA that the "insulating film" covers something other than electrically insulative materials; in the case of the '832 and '888 patents, heat protective materials.

## XIV.  DISPUTED TERM (U.S. PAT. NOS. 10,920,971)

### A.     "A Ground-Anchorable Lower Housing"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning; alternatively, **"a ground-anchorable lower enclosure"** | **a ground-anchorable lower body that contains an assembly of components** |

57.     The term "a ground-anchorable lower housing" appears in asserted independent claims 1, 7, and 9 of the '971 Patent.  I have been informed that the parties agree that "a ground-anchorable lower housing" is something that is "ground-anchorable," but disagree on the meaning of the phrase "lower housing."  Plaintiff appears to contend that the phrase does not require construction or alternatively means a "lower enclosure."  Defendant contends the phrase means a "lower body

that contains an assembly of components" within the context of the '971 patent. In my opinion, Defendants' proposed construction of "a ground-anchorable lower housing" is correct and accurately reflects how a POSITA would understand this term in view of the intrinsic and extrinsic records of the '971 patent at the time the '971 patent was effectively filed. It is also my opinion that Plaintiff's proposed construction of "a ground-anchorable lower housing" is inconsistent with intrinsic and extrinsic evidence and does not match with how a POSITA would understand this term.

58. For the reasons described below, Defendant's proposed construction of "a ground-anchorable lower housing" should be adopted.

### 1.   Intrinsic and Extrinsic Evidence Supports Defendant's Construction

59. Construction of "a ground-anchorable lower housing" is necessary in this case because the phrase is subject to different meanings depending on the context. The intrinsic record confirms that the inventors understood "housing" not in its general sense to mean a mere "enclosure," but rather a specific kind of enclosure; namely, one that contains an assembly of components. For example, each of independent claims 1, 7, and 9 of the '971 patent recites both an LED driver and an LED light source in a "monolithic upper housing." *See* Ex. R at 50:6-7, 36-37, 54-56. The LED driver is an assembly of electrical components and, when combined with the light source, forms a larger assembly. *See, e.g., id.* at 19:32-38; 23:60-63;

- 42 -

FIG. 6B.  Other portions of independent claims 1 and 9 provide further support by requiring a beam-angle changing assembly comprising "a beam-angle changing lens that is repositionable in [a] slotted cylinder."  *Id*. at 50:12-15, 58-61.  Dependent claims 2, 3, 10 and 11 add further structures to this assembly.  *See, e.g., Id*. at 50:16-23; 50:62 to 51:2 (adding a lens holder).  The parties also agreed that the term "driver housing," as used in the Asserted Claims of the '101 patent (which has an almost identical specification compared to the '971 patent), should be construed to mean "an enclosure that contains the LED driver assembly . . . ."  *See* Joint Claim Construction Statement, Exhibit A (Doc. 40-1) at 1.

60.     The specification of the '971 also evidences that the inventors understood and used the word "housing" to mean bodies/enclosures that contain assemblies of components.  For instance, the patent describes main fixture housing 532 as having a cavity for containing "various components," such as an assembly of wires 578 and light source 528, as well as a "moveable holder assembly 513."  Ex. R at 6:65 to 7:9; 10:18-28; 15:6-20.  A driver housing 540 is also disclosed for containing an LED driver assembly 554.  *Id*. at 20:43-50, Fig. 6B.  The driver housing includes a base portion labeled 540A and a upper portion 540B that includes the tilting mechanism.  *Id.,* at 20:51-59.

61.     The '971 patent also discloses a flood light having a fixture main body 1628, which is described as a "housing containing a cavity" for "components of the

- 43 -

flood light upper assembly . . . ." *Id.* at 29:44-51.  With respect to the in-ground embodiments, the '971 patent discloses a fixture housing body 2338 for containing a "moveable light assembly 2313 and a lower fixture main body 2332 . . . ." *Id.* at 33:58-63.  A lower holder guide 518 is described as housing an assembly of "the beam angle main holder body 512 and beam angle changing lens 514." *Id.* at 9:7-9.  Beam angle changing dial 2318 is described as housing an assembly that includes lens 2316 and retaining snap 2320.  *Id.* at 32:1-37; 33:4-11.  Nowhere do the inventors use the word "housing" to identify any body or enclosure that does not contain an assembly of components.

62.     The extrinsic evidence further supports Defendant's construction.  While the word "housing" may mean different things in different contexts, the word ordinarily means "5. a fully enclosed case and support for a mechanism."  Ex. C (Random House Kernerman Webster's College Dictionary, Copyright 2010) at 7.  A "mechanism" is generally understood to mean "1b. The arrangement of connected parts in a machine."  Ex. B (American Heritage Dictionary, 4th Ed., Copyright 2001) at 7.  Further, NEMA (National Electrical Manufacturers Association) defines an electrical "enclosure" as "a cabinet or box that protects electrical or electronic equipment and prevents electrical shock. Enclosures are usually made from rigid

plastics or such metals as steel, stainless steel, or aluminum."[3] Whereas a conduit is simply a "a pipe, tube or duct for protecting electrical wires or cables."[4]

63.    A "lower housing" therefore may be understood in its common, everyday sense as a lower body that contains an "arrangement of connected parts" (*i.e.*, an assembly of components).  This is entirely consistent with how the inventors used "housing" in the '971 patent.  In addition, it is my opinion that a POSITA would not consider a structure that passes wires from one part of a device to another (e.g., an electrical conduit) to be a "housing." Defendant's construction of "a ground-anchorable lower housing" should therefore be adopted.

## 2.    The Intrinsic Record Does Not Support Plaintiff's Construction

64.    Plaintiff's proposed construction of "a ground-anchorable lower housing" is overbroad and goes far beyond what a POSITA would understand to be a "housing" within the context of the '971 patent.

65.    The specification of the '971 patent confirms this.  This naming convention of the '971 Patent is consistent with usage in the relevant art, where housings and conduits are regarded as distinct classifications of structures.

66.    Indeed, the claims and specification of the '971 patent make clear that the inventors used "housing" to identify something more than merely a conduit for

---

[3] https://www.nema.org/directory/products/view/enclosures

[4] https://www.merriam-webster.com/dictionary/conduit

wires or an "enclosure" in its general sense.  That something more is the concept, embodied in the multiple examples of the '971 patent and the extrinsic evidence, that a "housing," such as the "lower housing" of the Asserted Claims, is something that contains a mechanism or "assembly of components."

67.    For example, Plaintiff has cited only two examples as evidence of a housing that does not contain components.  First, in the ITC Investigation, WAC incorrectly identified the feature 540B as an example of a housing. Complainant's Opening Markman Brief, 21. In fact, 540B is nothing more than a metal extension of the driver housing to which the tilting mechanism 536 is attached.  It does not enclose or house anything.



'971 Patent, Fig. 6B excerpt, highlighted

- 46 -

68.    Second, the Plaintiff incorrectly identified the threaded shaft 561 of enclosure cap 560 as an example of a housing with no components in the ITC Investigation. Complainant's Opening Markman Brief, 21.  In fact, the identified "housing" is nothing more than the bottom of the *actual* driver housing 540.  A POSITA would not identify the threaded shaft as a housing or enclosure; it is a conduit or pipe for wires.



'971 Patent, Fig. 6B excerpt, highlighted

69.    There are numerous other examples in the '971 patent that are conduits for wires that are not called "housings." For example, the tilting mechanism 536 of the '971 patent includes a passageway for wires 578, but is not described as a "housing."  *See* Ex. R at 20:17-23; FIG. 6B.  The '971 patent even discloses multiple hollow "threaded shafts" that support and carry power wires into the bottoms of light fixtures, but the patent does not refer to these shafts as "housings."  *See, e.g.,* Ex. R at 25:21-25; FIGS. 5, 6B (disclosing threaded shaft 561 acting as a conduit for power

supply wires 576); 34:1-18; 39:65 to 40:6; FIG. 32 (disclosing "threaded shaft" for

carrying power wires 3208 into the bottom of fixture housing 2338).



FIGURE 6B                    FIGURE 32

*Id*. at FIGS. 6B, 32 (annotated).  The patent also fails to identify as "housings" other

structures that merely enclose or act as conduits for wires, such as silicone rubber

gasket 550.  *See, e.g.,* Ex. R at 23:63 to 24:27; FIG. 6B (describing and illustrating

"gasket 550" as having holes through which wires 578 extend).



FIGURE 6B

*Id*. at FIG. 6B (annotated); *see also id*. at 11:63-67 (describing as a "gasket" a rubbery block through which power wires pass); 25:25-29 (describing as a "bracket" a structure having an "opening" through which wires 576 extend). Silicone gaskets (such as gasket 550) are clearly not "housings" within the context of the '971 patent.

### 3.    The Accused Products Only Include a Conduit for Wires Below the Main Housing

70.    In its contentions, Plaintiff takes the position that the lower knuckle shafts of certain Accused Products (the D5A1-aW, D5A2-aW, and F5A1-aW (the "'971 Accused Products")), are enclosures that meet the "ground-anchorable lower housing" requirement of claims 1 and 7-9, presumably because each circumscribes a power wire.  For example, below is an excerpt from Plaintiff's infringement contentions correlating the "lower housing" requirement to a metal knuckle shaft of

- 49 -

the '971 Accused Products above an image of the D5A1-aW (one of the '971

Accused Products) disassembled to better show the shaft.



*See, e.g.,* Ex. V (exhibit 2 to Plaintiff's infringement contentions against Defendant's

D5A1-aW, D5A2-aW, and F5A1-aW fixtures) at 10.



Ex. L.

71.    As is clear from the above, knuckle shafts of the '971 Accused Products are not "housings," nor do they correlate in any way to structures identified in the '971 patent as "housings."  They are nothing more than conduits for wires that include attachment points for ground anchors and tilt adjustment.  The fact they have wires running through them is of little relevance and does not transform these shafts into "housings" within the context of the '971 patent.

## XV.  CONCLUSION

72.    This declaration represents only those opinions I have formed to date. I reserve the right to revise, supplement, and/or amend my opinions stated herein based on new information and on my continuing analysis of the materials produced in this litigation.

73.    I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statement and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

74.    I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washougal, WA on October 10, 2022.

Thomas L. Credelle

- 52 -

# APPENDIX A

## Thomas L. Credelle
## Curriculum Vitae

## Professional Summary

Mr. Credelle is a recognized expert in the flat panel/touch industry with over 40 years of expertise in all aspects of flat panel displays, LEDs, LED displays, and optics. He has made significant contributions in the areas of R&D, engineering, marketing, and senior management.  He has served at an executive level at start-up businesses within major corporations and start-up companies in Silicon Valley and has had extensive interaction with flat panel producers and customers in Japan, Taiwan, Korea and China.  Mr. Credelle holds 84 issued US patents in various flat-panel related technologies including display design, display electronics, materials, algorithms, systems, RFID, and optics, with additional pending.

Mr. Credelle is a Fellow of the Society for Information Display and currently consults regarding technology, business, and patent issues involving Flat Panel Display and LED Technology for various companies.  He has written expert-analysis reports for private clients on patent portfolios of over 500 patents and has written numerous IPR ITC, and District Court Case reports and has given depositions on many.  He has testified in two District Court cases and one ITC case.

## Expertise

- Flat Panel Display Technology
- LEDs and LED lighting
- Display electronics
- Electro-optics
- Patent analysis
- Expert witness (reports, testimony)
- TFT and Liquid Crystal Display R&D

## Education

| Year | College or University | Degree |
|------|----------------------|--------|
| 1970 | Massachusetts Institute of Technology | M.S., Electrical Engineering<br>Emphasis:  Electro-optics and Solid State Physics<br>Thesis: "Optical Properties of High Purity Stannic Oxide" |
| 1969 | Drexel University | B.S., Electrical Engineering (Honors Program) |

1

> **Thomas L. Credelle**
> **Curriculum Vitae**

## Professional Experience

| | |
|---|---|
| From: | 2008 |
| To: | Present |
| Organization: | **TLC Display Consulting** |
| Title: | President |

Summary:
- Technical consulting in the field of flat panel displays, LEDs, and display electronics
- Business/patent consulting in the fields of displays, LEDs, optics, new technology

| | |
|---|---|
| From: | 2016 |
| To: | 2018 |
| Organization: | **RealD** |
| Title: | Acting CEO, RealD Me (2016-2017), Strategic Advisor, RealD 2017-2019) |

Summary:
- Business and technical advisor to RealD Intelligent Backlight Business Unit

| | |
|---|---|
| From: | 2012 |
| To: | 2016 |
| Organization: | **Innova Dynamics, Inc.,** San Francisco, CA |
| Title: | VP, Application Engineering and Device Performance |

Summary:
- Primary interface between customer and product engineering
- Testing and qualification of all products
- Business development/technical contact for new opportunities

| | |
|---|---|
| From: | 2008 |
| To: | 2018 |
| Organization: | **Display Engineering, Inc.** San Jose, CA |
| Title: | Contractor |

Summary:
- Design and testing of high-brightness LED backlights for outdoor signage
- Circuit design and thermal analysis of LED light bars
- Developed new methods for passive cooling of LED light sources

<div style="border:1px solid black; text-align:center">

**Thomas L. Credelle**
**Curriculum Vitae**

</div>

| | |
|---|---|
| From: | 2007 |
| To: | 2008 |
| Organization: | **Puredepth, Inc**., Redwood City, CA and Auckland, NZ |
| Title: | Senior VP Engineering |
| Summary: | |

- Recruited to establish first senior management leadership position for hardware and software engineering related to Puredepth's Multi Layer Display (MLD) technology.

- Rapidly learned details of technology, established new development plans, and supported customer engagements in US, Korea, and Japan.

- Divided time between US and NZ offices, supporting sales/marketing and leading engineering effort.

| | |
|---|---|
| From: | 2001 |
| To: | 2007 |
| Organization: | **Clairvoyante, Inc**, Cupertino, CA |
| Title: | VP Engineering |
| Summary: | |

- Responsible for engineering, product development, product roadmap, marketing of technology that improves resolution and reduces power of color flat panel displays.

- Responsible for applied R&D, IC development, customer training and support for all technology integration programs.

- Creation of new intellectual property to advance adoption of Clairvoyante technology.

- Monthly interaction with leading LCD producers in Taiwan, Korea, Japan; management of all vendors relating to product development (8-10 on-site visits per year).

| | |
|---|---|
| From: | 1999 |
| To: | 2001 |
| Organization: | **Alien Technology Corporation**, Morgan Hill, CA |
| Title: | VP of Operations |
| Summary: | |

- Key member of management team to develop novel technology for nanoblock-IC assembly using fluidic process. Responsible for facilities, manufacturing operations, IT, and HR; managed $20M construction project for mfg.

- Key contributor to display-related use of Alien manufacturing processes.

- Contributed to patent portfolio for Alien with key inventions in Nanoblock™ IC manufacturing techniques for displays and RFID tags.

3

**Thomas L. Credelle**
**Curriculum Vitae**

4

From:         1996
To:           1999
Organization: **Motorola**, Flat Panel Display Division, Tempe, AZ
Title:        Director, Product Marketing
Summary:
- Responsible for establishing market direction and initial sales approach for new Field Emission Displays (FED) under development within the Division.
- Won potential business for initial small FEDs in industrial and automotive applications.
- Established and managed marketing communications department, creating new brand image for product as well as managing all trade show activities.
- Contributed to product development and spec generation.  Generated patent disclosures aimed at solving customer-related issues.

From:         1994
To:           1996
Organization: **Allied Signal**, Los Gatos, CA
Title:        Director, Advanced Product Marketing
Summary:
- Responsible for establishing product marketing direction and establishing customer contacts for newly-developed optical films for viewing angle enhancement for LCDs.
- Participated in product development, product improvement based on customer input.

From:         1991
To:           1994
Organization: **Apple Computer**, Cupertino, CA.
Title:        Manager, Display Engineering
Summary:
- Responsible for all LCD engineering and qualification for first PowerBook notebook computers introduced to market.
- Extensive interaction with Asian suppliers.
- Generated patent disclosures related to LCD integration in notebook PCs

4

| **Thomas L. Credelle** |
| **Curriculum Vitae** |

| | |
|---|---|
| From: | 1986 |
| To: | 1991 |
| Organization: | **GE** R&D Center, Schenectady, NY |
| Title: | Manager, TFT LCD Research and Development |
| Summary: | ▪ Managed R&D in TFT and LCD technology for avionics applications. Led the team that built the first 1 million pixel color LCD. Led development of various optical devices based on liquid crystal materials. |
| | ▪ Established photonics effort based on liquid crystal technology. |

| | |
|---|---|
| From: | 1970 |
| To: | 1986 |
| Organization: | **RCA** Sarnoff Labs, Princeton, NJ |
| Title: | Individual Contributor, then Group Manager |
| Summary: | ▪ Increasing levels of responsibility in the R&D of optical materials and flat panel displays. |
| | ▪ Key contributor to novel methods for large screen flat panel TFT. |
| | ▪ Established TFT LCD Program at Sarnoff Labs in 1983. |
| | ▪ Led development of first polySi TFT LCDs at Sarnoff Labs. |

## Legal Consulting

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Deposition on patent dispute |
| Client: | Alien Technology |
| Case Name: | Alien v. Avery, Case No. 08-cv-00795 |
| Services Provided: | Deposed as expert and inventor on behalf of Alien |
| Date: | October 29, 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Patent Infringement, LCD Projection |
| Client: | McKenna Long & Aldridge LLP |
| Case Name: | Undisclosed |
| Services Provided: | Non-testifying expert on ITC case |
| Date: | November 2011 |

5

| **Thomas L. Credelle** |
| **Curriculum Vitae** |

*Expert Engagement:*

| Type of Matter: | LCD backlight |
| Client: | Steptoe and Johnson LLP on behalf of LG |
| Case Name: | In the Matter of Certain Devices for Improving Uniformity Used in a Backlight Module and Products Containing the Same Inv. No. 337-TA-805 |
| Services Provided: | Non-testifying expert on ITC case (settled) |
| Date: | November 2011 |

*Expert Engagement:*

| Type of Matter: | Display driving method for eBooks |
| Client: | Klarquist Sparkman LLP on behalf of Amazon (v. Positive Technologies) |
| Case Name: | 2:11-cv-2226, N.D. Calif. |
| Services Provided: | Expert Reports, Testifying Expert (settled) |
| Date: | October 2012 – April  2013 |

*Expert Engagement:*

| Type of Matter: | Display driving method for eBooks |
| Client: | Alston and Bird LLP on behalf of Barnes and Noble (v. Positive Technologies) |
| Case Name: | 3:11-cv-02226-SI |
| Services Provided: | Testifying expert on District Court Case (settled) Non infringement and non-enablement reports written. |
| Date: | March 2013 – July 2013 |

*Expert Engagement:*

| Type of Matter: | LCD driving method |
| Client: | Kenyon and Kenyon LLP on behalf of Sony (v. Surpass) |
| Case Name: | IPR2015-0863 |
| Services Provided: | IPR Reports and Deposition |
| Date: | Jan 2015-Mar 2016 |

*Expert Engagement:*

| Type of Matter: | LCD Optics and TFT design |
| Client: | Marc Labgold on behalf of Funai (v. Gold Charm Ltd.) |
| Case Name: | IPR2015-01448 |
| Services Provided: | IPR Report |
| Date: | Apr, 2015 – Jul, 2015 |

*Expert Engagement:*

| Type of Matter: | LCD Backlights using LEDs |
| Client: | Shearman & Sterling LLP/Fried Frank LLP on behalf of Mercedes Benz (v. Innovative Display Technologies) |
| Case Name: | IPR2015-01995, IPR2015-01115, IPR2015-01113 and 2: 14-cv-00535 TXEDC |
| Services Provided: | IPR Expert Reports |
| Date: | Mar 2015 – May 2015 |

<div style="text-align:center">

**Thomas L. Credelle**
**Curriculum Vitae**

</div>

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | TFT array and LCD panel interconnect |
| Client: | Covington & Burling on behalf of Samsung Display Co. (v. MiiC & Partners) |
| Case Name: | IPR205-01469, IPR2015-01499 |
| Services provided: | IPR Expert Reports |
| Date: | May 2015- Mar 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | LCD Backlights using LEDs |
| Client: | Mayer Brown on behalf of KJ Pretech (v. Innovative Display Technologies) |
| Case Name: | IPR2015-01866, IPR2015-01867, IPR2015-01868 |
| Services Provided: | IPR reports and depositions (3) |
| Date: | Aug 2015-Jun 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | LCD backlights using LEDs |
| Client: | Gibson, Dunn, and Crutcher LLP on behalf of Vizio (v. Delaware Display Group LLC) |
| Case Name: | Case No. 13-cv-2112 |
| Services Provided: | Non-infringement Report, Deposition, Testifying Expert (settled) |
| Date: | Sep 2015-Mar 2017 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | LCD manufacturing, TFT array design |
| Client: | Sughrue Mion PLLC on behalf of TCL |
| Case Name: | Arbitration (Hong Kong) between AUO and TCL |
| Services Provided: | Non-infringement analysis of TFT array design (settled) |
| Date: | Jun 2017 – Sep 2017 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | LED display panels |
| Client: | Adduci Mastriani & Schaumberg on behalf of Ultravision Technologies LLC (v. >20 Chinese companies) |
| Case Name: | ITC Case 337-TA-1114 |
| Services Provided: | Expert Reports (Invalidity and Non-infringement) and Deposition (3 days) |
| Date: | Jan 2018 – Feb, 2019 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | LCD gamma circuit |
| Client: | K&L Gates on behalf of Wistron (v. plaintiff Phenix Longhorn) |
| Case Name: | IPR2018-01255, 2:17 cv-00711 TXEDC |
| Services Provided: | Expert report and Expert Testimony as needed (settled) |
| Date: | May 2018 – Jun 2019 |

<div style="border:1px solid">

# Thomas L. Credelle
# Curriculum Vitae

</div>

8

*Expert Engagement:*
Type of Matter:        LED packaging
Client:                Davidson, Berquist, Jackson & Gowdey, LLP on behalf of Document Security
                       Systems (v. defendants Seoul Semiconductor, Nichia Corp, Cree, Inc., Everlight
                       Electronics)
Case Name:             IPR2018-00966, 2018-01165
Services Provided:     Expert Reports, Depositions (2) and Expert Testimony at trial as needed
Date:                  June 2018 – May 2019

*Expert Engagement:*
Type of Matter:        TFT-LCD technology
Client:                Vinson and Elkins on behalf of AUO (v. plaintiff Vista Park Ventures)
Case Name:             2:18 cv-00276, 00278, 00279 TXEDC
Services Provided:     Expert reports and Expert Testimony as needed (settled)
Date:                  Dec 2018 – Sep 2019

*Expert Engagement:*
Type of Matter:        LED Display Panels
Client:                Fabricant LLP on behalf of Plaintiff Ultravision (v. >10 companies)
Case Name:             2:18 cv-00112, 00118, 00150 TXEDC
Services Provided:     Expert report and Expert Testimony as needed; two days deposition in 2020, two
                       depositions in 2021.
                       Testified at trial May 2021
Date:                  Jan 2019 – Present

*Expert Engagement:*
Type of Matter:        TFT-LCD technology
Client:                McDermott, Will and Emery on behalf of TCL (v. plaintiff Vista Park Ventures)
Case Name:             2:19 cv-00188, 00189, 00190, 00191 TXEDC
Services Provided:     Expert reports and Expert Testimony as needed (settled)
Date:                  Aug 2019 – Oct 2019

*Expert Engagement:*
Type of Matter:        TFT-LCD technology
Client:                McDermott, Will and Emery on behalf of GiantPlus (v. plaintiff Vista Park
                       Ventures)
Case Name:             2:19 cv-00183, 00184, 00185, 00187 TXEDC
Services Provided:     Expert reports and Expert Testimony as needed (settled)
Date:                  Oct 2019 – Jan, 2020

<div style="border:1px solid black; text-align:center">

**Thomas L. Credelle**
**Curriculum Vitae**

</div>

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | TFT-LCD technology |
| Client: | Vincent and Elkins on behalf of JDI (v. plaintiff Vista Park Ventures) |
| Case Name: | 2:19 cv-00323, 00324, 00325 TXEDC |
| Services Provided: | Expert reports and Expert Testimony as needed (settled) |
| Date: | Nov 2019 – Jun 2020 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | TFT-LCD technology |
| Client: | Sidley on behalf of LG Electronics (v. defendant Hisense) |
| Case Name: | 2:19 cv-09474 CACDC |
| Services Provided: | Expert reports and Expert Testimony as needed (settled) |
| Date: | Feb. 2020 – Jan. 2021 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Quantum dot technology |
| Client: | Murtha Law on behalf of RPI (v. defendant Samsung) |
| Case Name: | 2:19 cv-20097 KM-ESK |
| Services Provided: | Expert reports and Expert Testimony as needed |
| Date: | Jan. 2020 – Jun 2021 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | OLED, touch panels |
| Client: | RAK Law on behalf of Solas (v. defendant Samsung) |
| Case Name: | 2:19-CV-00152-JRG (E.D. Tex) |
| Services Provided: | Expert reports and Expert Testimony; two depositions in 2020. Testified at trial Mar. 2021. |
| Date: | Apr. 2020 – Mar. 2021 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | LCD technology |
| Client: | Morgan Lewis on behalf of Fuji Film (v. plaintiff Vista Park Ventures) |
| Case Name: | 2:20 cv-00064, 65, 66 E.D. Tex. |
| Services Provided: | Expert reports and Expert Testimony as needed (settled) |
| Date: | Jul. 2020 – Oct 2020 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Touch panels |
| Client: | DLA Piper, Alston and Bird, on behalf of Microsoft, Dell (v. plaintiff Neodron) |
| Case Name: | 2:19-CV-00318-ADA (W.D. Tex) |
| Services Provided: | Expert Reports and Expert Testimony as needed (settled) |
| Date: | Aug. 2020 – Nov. 2020 |

9

## Thomas L. Credelle
## Curriculum Vitae

*Expert Engagement:*

Type of Matter:        LCD
Client:                Vincent and Elkins on behalf of Japan Display Inc (v. defendant Tianma)
Case Name:             2:20-CV-00283, 284, 285-JRG (E.D. Tex)
Services Provided:     Expert Reports, depositions, and Expert Testimony as needed (settled)
Date:                  Jan 2021 – Jan 2022

*Expert Engagement:*

Type of Matter:        LCD
Client:                Perkins Coie on behalf of Truly Semiconductor, Hannstar (v. plaintiff Vista Park Ventures)
Case Name:             2:20-CV-250, 251, 252 (E.D. Tex)
Services Provided:     Expert Reports and Expert Testimony as needed (settled)
Date:                  Jan 2021 – June 2021

*Expert Engagement:*

Type of Matter:        Quantum dots
Client:                Mintz on behalf of Nanoco (v. defendant Samsung)
Case Name:             2:20-CV-00038-JRG (E.D. Tex)
Services Provided:     Expert Reports, depositions, trial (Oct 2022)
Date:                  Jan 2021 - present

*Expert Engagement:*

Type of Matter:        OLED circuits
Client:                Morrison Forster on behalf of JOLED (v. defendant Samsung)
Case Name:             Case No. 6:20cv559 (W.D. Tex.)
Services Provided:     Expert Reports and Expert Testimony (settled)
Date:                  July 2020 – April 2021

*Expert Engagement:*

Type of Matter:        OLED circuits
Client:                Perkins Coie on behalf of AUO (v. defendant Samsung)
Case Name:             TBD
Services Provided:     Expert Reports and Testimony (settled)
Date:                  Feb. 2021 – May 2021

*Expert Engagement:*

Type of Matter:        LED circuits
Client:                Kim IP on behalf of CAST Lighting (v. Plaintiff WAC Lighting)
Case Name:             ITC Inv. No. 337-TA-1261
Services Provided:     Expert Reports and Testimony (settled)
Date:                  May 2021 – Oct 2021

10

<div style="text-align: center; border: 1px solid black;">

**Thomas L. Credelle**
**Curriculum Vitae**

</div>

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | OLED circuits |
| Client: | RAKLaw on behalf of Solas, Ltd. (v. Defendant Samsung) |
| Case Name: | ITC Inv. No. 337-TA-1243 |
| Services Provided: | Expert Reports and Testimony at Hearing Nov. 15-19, 2021 |
| Date: | May 2021 – Dec 2021 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | OLED circuits |
| Client: | PV Law on behalf of TCL (vs. Plaintiff SEL Co.) |
| Case Name: | 8:21-cv-00554-JAK-ADS (CDCA) |
| Services Provided: | Expert Reports and Depositions (trial expected in April, 2023) |
| Date: | July 2021 – present |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | LED circuits |
| Client: | Carmichael IP on behalf of Lynk Labs (vs. defendant Samsung) |
| Case Name: | IPR Proceedings |
| Services Provided: | Expert Reports and Depositions |
| Date: | Jan 2022 - present |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | OLED circuits |
| Client: | Baker Botts on behalf of ultrasound mfr (vs. defendant ultrasound mfr) |
| Case Name: | District Court case TBD |
| Services Provided: | Expert Reports and Depositions |
| Date: | Jul 2022 - present |

11

### Thomas L. Credelle
### Curriculum Vitae

## Consulting Projects

*Consulting Engagement:*

| | |
|---|---|
| Client: | Tessera |
| Services Provided: | Business case analysis for M&A department |
| Date: | Mar 2008 to 2011 |

*Consulting Engagement:*

| | |
|---|---|
| Client: | Sipix Imaging |
| Services Provided: | Technical consulting on display algorithms |
| Date: | Mar 2008 to 2009 |

*Consulting Engagement:*

| | |
|---|---|
| Client: | Holox Technologies, Inc. (self-funded start up in holographic optics) |
| Services Provided: | CEO; business leadership, fund raising, market analysis, optical design of advanced diffusers for LCD backlights, solar collectors, window films. |
| Date: | Sept 2008 to June 2012 |

*Consulting Engagement:*

| | |
|---|---|
| Client: | Innova Dynamics, Inc. |
| Services Provided: | Technical and business development consulting in touch screen technology |
| Date: | October 2011 to November 2012 |

*Technical and Patent Consulting:*

| | |
|---|---|
| Client: | LG Display |
| Services Provided: | Technical consulting on pixel processing algorithms, OLED displays; patent generation for advanced pixel concepts for OLED. |
| Date: | Aug 2009 to Dec 2011 |

*Consulting Engagement:*

| | |
|---|---|
| Client: | Scivax |
| Services Provided: | Technical and business development consulting in nanoimprinting technology |
| Date: | Feb 2018 to Jul 2018 |

12

**Thomas L. Credelle**
**Curriculum Vitae**

## Professional Affiliations, Achievements & Awards

- Fellow of the Society for Information Display (SID)
- Past Director, SID Symposium Committee (10 years)
- Conference and Program Chair, SID Symposium and IDRC
- Past Member, SID Program Committee (15 years)

## US Patents & Publications

| Patent | Date | Description |
|---|---|---|
| 10,163,985 | 12/25/2018 | Subpixel arrangement structure for a display device |
| 9,583,034 | 02/28/2017 | Subpixel arrangement structure for a display device |
| 9,041,625 | 05/26/2015 | Subpixel arrangement structure for a display device and display device |
| 9,001,167 | 04/07/2015 | Display panel having crossover connections effecting dot inversion |
| 8,933,959 | 01/13/2015 | Subpixel layouts and subpixel rendering methods for directional displays and systems |
| 8,876,937 | 11/04/2014 | Production of nanostructures |
| 8,797,344 | 08/05/2015 | Memory structures for image processing |
| 8,754,913 | 06/17/2014 | Subpixel arrangement structure of display device |
| 8,704,744 | 04/22/2014 | Systems and methods for temporal subpixel rendering of image data |
| 8,633,886 | 01/21/2014 | Display panel having crossover connections effecting dot inversion |
| 8,519,910 | 08/27/2013 | Image processing method and display device using the same |
| 8,516,683 | 08/27/2013 | Methods of making a radio frequency identification (RFID) tags |
| 8,456,496 | 06/04/2013 | Color flat panel display sub-pixel arrangements and layouts for sub-pixel rendering with split blue sub-pixels |
| 8,456,414 | 06/04/2013 | Gamma adjustment with error diffusion for electrophoretic displays |
| 8,436,799 | 05/07/2013 | Image degradation correction in novel liquid crystal displays with split blue subpixels |
| 8,421,820 | 04/16/2013 | Methods and systems for sub-pixel rendering with adaptive filtering |
| 8,411,022 | 04/02/2013 | Multiprimary color display with dynamic gamut mapping |
| 8,405,692 | 03/26/2013 | Color flat panel display arrangements and layouts with reduced blue luminance well visibility |
| 8,378,947 | 02/19/2013 | Systems and methods for temporal subpixel rendering of image data |
| 8,294,741 | 10/23/2012 | Four color arrangements of emitters for subpixel rendering |
| 8,259,127 | 09/04/2012 | Systems and methods for reducing desaturation of images rendered on high brightness displays |
| 8,144,094 | 03/27/2012 | Liquid crystal display backplane layouts and addressing for non-standard subpixel arrangements |

13

**Thomas L. Credelle**
**Curriculum Vitae**

| | | |
|---|---|---|
| 8,134,583 | 03/13/2012 | Two color flat panel display sub-pixel arrangements and layouts for sub-pixel rendering with split blue sub-pixels |
| 8,035,599 | 10/11/2011 | Display panel having crossover connections effecting dot inversion |
| 8,018,476 | 09/13/2011 | Subpixel layouts for high brightness displays and systems |
| 8,013,867 | 09/06/2011 | Systems and methods for implementing improved gamut mapping algorithms |
| 7,969,456 | 06/28/2011 | Methods and systems for sub-pixel rendering with adaptive filtering |
| 7,876,341 | 06/25/2011 | Subpixel layouts for high brightness displays and systems |
| 7,864,194 | 01/04/2011 | Systems and methods for motion adaptive filtering |
| 7,791,679 | 09/07/2010 | Alternative thin film transistors for liquid crystal displays |
| 7,755,652 | 07/13/2010 | Color flat panel display sub-pixel rendering and driver configuration for sub-pixel arrangements with split sub-pixels |
| 7,701,476 | 04/20/2010 | Four color arrangements of emitters for subpixel rendering |
| 7,646,430 | 01/12/2010 | Display system having improved multiple modes for displaying image data from multiple input source formats |
| 7,592,996 | 09/22/2009 | Multiprimary color display with dynamic gamut mapping |
| 7,583,279 | 09/01/2009 | Subpixel layouts and arrangements for high brightness displays |
| 7,573,493 | 08/11/2009 | Four color arrangements of emitters for subpixel rendering |
| 7,573,448 | 08/11/2009 | Dot inversion on novel display panel layouts with extra drivers |
| 7,559,131 | 07/14/2009 | Method of making a radio frequency identification (RFID) tag |
| 7,505,053 | 03/17/2009 | Subpixel layouts and arrangements for high brightness displays |
| 7,492,379 | 02/17/2009 | Color flat panel display sub-pixel arrangements and layouts for sub-pixel rendering with increased modulation transfer function response |
| 7,417,648 | 08/26/2008 | Color flat panel display sub-pixel arrangements and layouts for sub-pixel rendering with split blue sub-pixels |
| 7,397,455 | 07/08/2008 | Liquid crystal display backplane layouts and addressing for non-standard subpixel arrangements |
| 7,283,142 | 10/16/2007 | Color display having horizontal sub-pixel arrangements and layouts |
| 7,260,882 | 08/28/2007 | Methods for making electronic devices with small functional elements supported on a carriers |
| 7,248,271 | 07/24/2007 | Sub-pixel rendering system and method for improved display viewing angles |
| 7,218,301 | 05/15/2007 | System and method of performing dot inversion with standard drivers and backplane on novel display panel layouts |
| 7,187,353 | 03/06/2007 | Dot inversion on novel display panel layouts with extra drivers |
| 7,184,066 | 02/27/2007 | Methods and systems for sub-pixel rendering with adaptive filtering |
| 7,167,186 | 01/23/2007 | Systems and methods for motion adaptive filtering |
| 7,084,923 | 08/01/2006 | Display system having improved multiple modes for displaying image data from multiple input source formats |
| 7,068,287 | 06/27/2006 | Systems and methods of subpixel rendering implemented on display panels |
| 7,046,256 | 05/16/2006 | System and methods of subpixel rendering implemented on display panels |
| 6,985,361 | 01/10/2006 | Electronic devices with small functional elements supported on a carrier |
| 6,917,368 | 07/12/2005 | Sub-pixel rendering system and method for improved display viewing angles |

> **Thomas L. Credelle**
> **Curriculum Vitae**

| | | |
|---|---|---|
| 6,816,380 | 11/09/2004 | Electronic devices with small functional elements supported on a carrier |
| 6,731,353 | 05/04/2004 | Method and apparatus for transferring blocks |
| 6,693,384 | 02/17/2004 | Interconnect structure for electronic devices |
| 6,606,247 | 08/12/2003 | Multi-feature-size electronic structures |
| 5,961,362 | 10/05/1999 | Method for in situ cleaning of electron emitters in a field emission device |
| 5,883,467 | 03/16/1999 | Field emission device having means for in situ feeding of hydrogen |
| 5,477,350 | 12/19/1995 | Interferometric spatial switch for polarized or unpolarized light using liquid crystal |
| 5,373,393 | 12/13/1994 | Optical interferometric device with spatial light modulators for switching substantially coherent light |
| 5,363,228 | 11/08/1994 | Optical device with spatial light modulators for switching arbitrarily polarized light |
| 5,345,321 | 09/06/1994 | Compact polarization dependent optical switching units |
| 5,319,477 | 06/07/1994 | Compact polarization independent optical switching units |
| 5,317,445 | 05/31/1994 | Optical device with spatial light modulators for switching polarized light |
| 4,630,893 | 12/23/1986 | LCD pixel incorporating segmented back-to-back diode |
| 4,598,227 | 07/01/1986 | Electron beam convergence and scanning structures for flat panel display device |
| 4,517,489 | 05/14/1985 | Modulator structure and method for flat panel display devices |
| 4,484,103 | 11/20/1984 | Color selection electron beam guide assembly for flat panel display devices |
| 4,362,966 | 12/07/1982 | Electron leakage reduction in flat panel display devices |
| 4,335,332 | 06/15/1982 | Focus mesh structure and biasing technique for flat panel display devices |
| 4,316,118 | 02/16/1982 | Guided beam display device |
| 4,298,819 | 11/03/1981 | Beam Clean up structure for flat panel display devices |
| 4,234,815 | 11/18/1980 | Flat display tube having shielding member between beam guide and screen |
| 4,174,881 | 11/20/1979 | Recording a synthetic focused-image hologram on a thermally deformable plastic |
| 4,153,856 | 05/08/1979 | Proximity focused element scale image display device |
| 4,148,636 | 04/10/1979 | Broadening the spatial frequency pass band of a thermoplastic layer |
| 4,137,478 | 01/30/1979 | Color flat panel television |
| 4,137,077 | 01/30/1979 | Broadening the spatial frequency pass band of a thermoplastic layer |
| 4,131,823 | 12/26/1978 | Modular flat display device with beam convergence |
| 4,121,137 | 10/17/1978 | System for achieving image uniformity in display devices |
| 4,103,205 | 07/25/1978 | Flat display device with beam guide |
| 4,103,204 | 07/25/1978 | Flat display device with beam guide |
| 4,088,920 | 05/09/1978 | Flat display device with beam guide |

**Thomas L. Credelle**
**Curriculum Vitae**

## Publications

1. "Thermoplastic Media for Holographic Recording," RCA Review: A Technical Journal (1972)
2. "Guided Beam Displays for Large Screen Flat-Panel Color TV," Information Display (1983)
3. "Recent trends in color avionic LCDs," Information Display (1987)
4. "Thin-film transistors for video applications," Inter. Display Research Conference Record (1988)
5. "TFT-LCD for video applications," Information Display (1989)
6. "LCDs," JTEC Panel Report on Display Technologies in Japan (1992)
7. "Viewing-Angle-Enhancement System for LCDs" SID Digest of Technical Papers (1995)
8. "SpectraVue™: A new system to enhance the viewing angle of LCDs," SID Journal (1997)
9. "The Business Case for Motorola's Flat-Panel-Display Division," Information Display (1997)
10. "MTF of high-resolution PenTile Matrix™ displays," Proc Eurodisplay (2002)
11. "Adding a White Subpixel," Information Display (2005)
12. "Low Power, High-Pixel-Density Mobile Displays Using PenTile RGBW™ Architectures**,"** SID Mobile Displays Digest of Technical Papers (2006)
13. *"Invited Paper:* High-Pixel-Density Mobile Displays: Challenges and Solutions," SID Digest of Technical Papers (2006)